UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KEVIN POTTER,

      Petitioner,

                            CASE NO. 2:09-CV-12049
v.                             CHIEF JUDGE GERALD E. ROSEN
                             MAGISTRATE JUDGE PAUL J. KOMIVES

WILLIE SMITH,

      Respondent.
      _____/

# **REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION ………………………………………………………………………… 2
II.    REPORT ……………………………………………………………………………………….. 2
      A.    *Procedural History* ………………………………………………………………… 2
      B.    *Factual Background Underlying Petitioner's Conviction* …………………………… 4
      C.    *Standard of Review* ………………………………………………………………. 6
      D.    *Ineffective Assistance of Counsel* ………………………………………………… 8
            1.    *Clearly Established Law* ………………………………………………….. 8
            2.    *Trial Counsel* ……………………………………………………………. 9
            3.    *Appellate Counsel* ……………………………………………………….. 12
      F.    *Recommendation Regarding Certificate of Appealability* ……………………………. 13
            1.    *Legal Standard* ………………………………………………………….. 13
            2.    *Analysis* …………………………………………………………………. 14
      G.    *Conclusion* ………………………………………………………………………... 15
III.   NOTICE TO PARTIES REGARDING OBJECTIONS …………………………………………… 15

\*     \*     \*     \*     \*

I.  RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus. The Court should also deny petitioner a certificate of appealability.

II. REPORT:

A.  *Procedural History*

Petitioner Kevin Potter is a state prisoner, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan.

On November 11, 2003, petitioner was convicted of conspiracy to commit first degree murder, MICH. COMP. LAWS § 750.157(a), 750.316, following a jury trial in the Wayne County Circuit Court. On December 9, 2003, he was sentenced to a mandatory term of life imprisonment without parole.

Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> I.  The admission into evidence of the Appellant's statements violated the corpus delicti rule, thereby requiring that he be granted a new trial.
>
> II. The failure to instruct Appellant's jury that conspiracy is a specific intent crime constituted reversible error as it denied him a fair trial.
>
> III. The trial court's identification instruction constituted reversible error as it improperly reduced the prosecution's burden of proof thereby denying Appellant a fair jury trial.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Potter*, No. 253716, 2005 WL 1490058 (Mich. Ct. App. June 23, 2005) (per curiam).

Petitioner, proceeding *pro se*, sought leave to appeal these same issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Potter*, 474 Mich. 938, 706 N.W.2d 23 (2005).

On August 26, 2006, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

> I. Petitioner was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel and due process under the U.S. Constitution where:
>
>   A. Trial counsel failed to conduct a complete pretrial investigation.
>
>   B. Trial counsel failed to make timely objections to several improper remarks by the prosecutor during closing arguments.
>
>   C. Appellate counsel failed to argue, on direct appeal, that trial counsel was ineffective for failing to conduct a complete pretrial investigation and for failing to make timely objections.

On March 29, 2007, the trial court denied petitioner's motion for relief from judgment. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Potter*, No. 284488, (Mich. Ct. App. Aug. 29, 2008); *People v. Potter*, 483 Mich. 894, 760 N.W.2d 484 (2009).

Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on May 27, 2009. As grounds for the writ of habeas corpus, he raises the claims that he raised in his motion for relief of judgment.

Respondent filed his answer on December 17, 2009. He contends that petitioner's claims are procedurally defaulted and petitioner has failed to show that the failure to review the claims would result in a miscarriage of justice.

B.  *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was accurately summarized in respondent's answer:

On September 19, 2002, victim Mario Allen was to be sentenced for his involvement in a drug case along with two co-defendants, Donald DeShazo (aka Brandon Kemp; and "D") and James Williams (aka "Jed") (Trial Transcript (TT) 11/3/03, pp 65-70). The victim's mother, Patricia Allen, testified that in the very early morning hours of September 19, 2002, she saw a conversion van parked in front of their home off and on throughout the morning. (TT 11/3/03, pp. 45-47). At approximately 7:30 a.m. her son got up to go to court for his sentencing. As Ms. Allen was upstairs in the house waking up her 12-year old, she heard approximately six gunshots. (TT 11/3/03, pp 47-48). She immediately ran outside and saw her son lying in the driveway, and she saw the same van from earlier near the corner. (TT 11/3/03, pp. 49). When the prosecutor showed Ms. Allen a photo of the van, Allen identified it as the van she saw that morning. (TT 11/3/03, pp 49-50). Ms. Allen also testified that she was aware her son sold drugs with "D" and "Jed." (TT 11/3/03, pp 50, 52-53, 54).

Michigan State Police Trooper David Vansingel testified regarding an undercover drug buy he made from the victim and the victim's co-defendants. (TT 11/3/03, pp 64-65). Trooper Vansingel testified that he offered them $9,500.00 while undercover to purchase cocaine from them, and that as a result, all three were charged with delivery or conspiracy to deliver cocaine. (TT 11/3/03, p 67). All three men entered guilty pleas and were to be sentenced on September 19, 2002, but the victim was shot; the two co-defendants withdrew their pleas as of Petitioner's trial date, the trial of those co-defendants has yet to take place. (TT 11/3/03, pp 70-71).

Kahari Wright testified that at approximately 10:00 a.m. or 10:30 a.m. on September 19, 2003, he went to purchase marijuana. When he got to the location where he wanted to buy the drugs, he saw Petitioner along with a man known as "Wig." (TT 11/3/03, pp 91-92). Petitioner and Wig said Wright was just who they had been looking for, and proceeded to ask him to help them burn the van and he was to be paid $1,000.00 for his assistance. (TT 11/3/03, pp 95, 100). Wright, Wig, and Petitioner then went to the van, approximately five or six blocks from the drug house. When the prosecutor showed Wright the same van photo that was shown to the victim's mother, Wright identified it as the van in question. (TT 11/3/03, p 96). Petitioner then went to a gas station and came back with a container of gas. Petitioner proceeded to douse a blanket with gasoline and the blanket was treated like a wick and it hung out of one of the doors. Wright was standing to the back of the van, and when Petitioner lit the fire, the inside of the van blew up and the fire melted Wright's skin. (TT 11/3/03, pp 97-99; 11/4/03, pp 4-5). Later, when Wright got home, EMS was called due to the pain he was experiencing from the burns. (TT 11/3/03, p 100).

4

Wright was in the hospital for several days, and when he returned home, Petitioner came to see him, which was not unusual since they had known one another all their lives. Petitioner told him that the van they burned on September 19, 2003 had been used in a murder. Petitioner said that Wig was driving the van and that Petitioner was dressed all in black and did the shooting. (TT 11/3/03, pp 102, 103; 11/4/03, pp 14-15). Wright testified that Petitioner told him he did the shooting because "D" and "Jed"—both of whom Wright identified from photographs as the same men who were the victim's co-defendant in the drug case—asked him to in exchange for $4,000.00. (TT 11/3/03, pp 104-105). Petitioner told Wright that the van had to be burned because it had been involved in a murder. When Wright asked for the $1,000.00 he had been promised, Petitioner said he would talk to Wig. (TT 11/3/03, p 106).

Kahari Wright's mother, Vicki Wright, also testified at trial. She stated that on September 20, 2002, the day after her son came home with burns on his body, Petitioner came by her home while her son was still in the hospital. (TT 11/3/03, pp 75-76). Petitioner spoke with Mrs. Wright and her husband and told them he wanted to tell the truth about what happened with the fire. (TT 11/3/03, pp 76-77). Petitioner asked them if they had heard about the man who had been killed in his driveway, and he spoke of a mask and a van. (TT 11/3/03, p 79). Petitioner wanted them to know that their son did not know what was happening with the van. (TT 11/3/03, p 81). Mrs. Wright also testified that they had known Petitioner for ten or twelve years and that he had been to their home before. (TT 11/3/03, p 84).

Scott Klass, an electrician, testified that he heard gunshots on the morning of September 19, 2002 and that he saw a man dressed all in black with a rifle and that he saw a van then come down the street, and the van was similar in style to the picture shown to him by the prosecutor. (TT 11/4/03, pp 61-63). Beverly Moore, who lives across the street from the victim's family, testified that on the morning in question she saw a van parked in front of the Wright house and she wondered why it was blocking their driveway. (TT 11/5/03, pp 8-9). Ms. Moore heard noises but assumed it was firecrackers, but when she went outside she saw a "ninja" all in black with a gun in his hand. (TT 11/5/03, p 13). Another neighbor, Katherine McFarland, also testified about hearing shots and seeing a man all in black with a big, AK 47 type gun in his hands. (TT 11/5/03, pp 39-40).

Marcus Gantz testified that while he and Petitioner were both in jail, Petitioner told him about the murder and that Petitioner had been doing some work for "D" on his dope house when "D" hired him to do another job. (TT 11/5/03, pp 59-62). Petitioner told him that the other job "D" had him perform was to kill Mario because "D" and "Jed" had entered pleas they did not want to enter and they knew Mario was going to testify. Petitioner told Gantz that the murder had to happen before sentencing on September 19, 2002. (TT 11/5/03, pp 65-66). Petitioner told Gantz about a van that was used, and he said he shot the victim in the morning and

5

did so with an AK 47. Petitioner also told him he was with a man named "Wig" when the shooting occurred. (TT 11/5/03, pp 64-65). Petitioner also told Gantz about "a van and a kid" and how Petitioner got the kid to help with burning a van but the kid had been burned up and almost passed away and the police then got involved. (TT 11/5/03, pp 66-67).

*Answer,* at 3-6.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

6

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts

them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.   *Ineffective Assistance of Counsel*

Petitioner raises three claims challenging the assistance rendered by his trial and appellate counsel. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.   *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment," and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the

8

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel in strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2. *Trial Counsel*

Petitioner first claims trial counsel conducted an inadequate pretrial investigation. Petitioner argues that on the day of the murder and van burning incident Detroit police officer S. McNair obtained a statement from a seventy-one year old man named Jay Derby. Petitioner contends that Derby indicated that he saw Kahari Wright alone set on fire the van that was involved in the murder. However, Wright testified at trial that he was standing at the back of the van when it caught fire and that he was burned. "It is well established that counsel has a duty to make reasonable investigation or to make reasonable decisions that make particular investigation unnecessary." *Strickland v. Washington,* 466 U.S. 668, 691 (1984). If petitioner was able to locate Derby, Derby would have offered cumulative testimony to that of Wright who stated he himself was present when the van was burned. Derby would not be able to place Wright, rather than petitioner, at the murder scene which was a totally different place from that where the arson on the van occurred. Defense counsel therefore could have reasonably believed that calling Derby as a witness would be unnecessary and "[b]ecause advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they

are based on professional judgment." *Id.* at 681. It was also established in *Strickland* that "when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial." *Id.*

Moreover, "Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain." *Woodfox v. Cain*, --- F.3d ---, 2010 WL 2505580, *26 (5th Cir. June 21, 2010) "For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by 'nam[ing] the witness, demonstrate[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense." *Id.* (citing *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009)). Petitioner named the witness and attached a preliminary complaint record as Exhibit 1 to his brief. However, petitioner has failed to demonstrate that the witness was available to testify or would have done so. More importantly, petitioner cannot show that the testimony would have been favorable to his particular defense. Based on the preliminary complaint record, Derby saw Wright at the scene where the van was set on fire. However, Wright admitted at trial he was present at the scene of the arson and that he was a lookout for petitioner. Derby was not present at the murder scene, which was different than the arson scene. Therefore, because Wright already testified he was present at the arson scene, trial counsel could have reasonably found that further investigation or eliciting testimony from Derby would not be necessary.

Petitioner next claims that trial counsel failed to make timely objections to several improper

10

remarks by the prosecutor during closing arguments. Petitioner alleges that counsel should have objected to the prosecutor's comments regarding defense witness Markell Boyd, who testified that he and prosecution's witness Marcus Gantz—who testified against petitioner—had a plan wherein they would go through petitioner's paperwork and obtain information to testify against petitioner to obtain deals for themselves. *See* Trial Tr., 11/6/03 at 5-8. The prosecutor stated "[a]nd who knows, maybe Mr. Potter will testify for him [Boyd] in his trial that's coming up—or one of his trials that's coming up." *See Id.* at 94.

On cross examination, the prosecutor was able to challenge Boyd's testimony regarding a scheme with Gantz by pointing out that Gantz at trial was not able to identify by name the "kid" petitioner spoke about when petitioner told Gantz about the arson of the van. *See id.* at 13. The fact that Boyd, on the other hand, knew the "kid's" name as Kahari Wright when Boyd testified can lead to the presumption that Boyd may have obtained Wright's name by talking with petitioner himself in regard to testifying for the defense. *See id.* at 13-14. Boyd also admitted that in the days before he testified, he and petitioner were sitting in custody together and petitioner spoke to Boyd and asked him to tell the truth. *See id.* at 17-18. The prosecutor stated "he [Boyd] only testified to what Potter told him to say when they were sitting together waiting to testify, or waiting to come into court. He [Boyd] had very limited knowledge of this case and that's what he learned from Kevin Potter when Kevin Potter told him what to say." *See id.* at 95-96. In his rebuttal the prosecutor also stated "or are we to think that Mr. Boyd and Mr. Potter have been working on deals for each other to see how they can help each other." *See id.* at 114.

Finally, petitioner argues that trial counsel failed to object to comments by the prosecutor in his closing arguments. The prosecutor argued that its own witness, Marcus Gantz, would suffer

11

hardships in prison for testifying against petitioner. The prosecutor stated "Marcus Gantz has to go to prison as a snitch. What do you think happens to people that go to prison as a snitch? It's not a pleasant experience." *Id.* at 88.

Petitioner argues that none of the above remarks by the prosecutor were supported by the evidence presented, and thus trial counsel should have objected to them. It is established that the prosecution may not argue purported facts that are not in evidence and are prejudicial. *See United States v. Wiedyk,* 71 F.3d 602, 610 (6th Cir. 1995) However, prosecutors "must be given leeway to argue reasonable inferences from the evidence." *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996). For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). Here, the prosecutor has not committed any misconduct under clearly established federal law. Rather, the prosecutor argued that there was a reasonable inference that petitioner may have told Boyd what to say at trial, and petitioner perhaps might return the favor at Boyd's upcoming trial. It could also be reasonably inferred that Gantz would suffer hardships once he returned to prison for being a "jailhouse snitch." Therefore, petitioner's claims that counsel failed to object to improper remarks by the prosecutor are meritless.

3. *Appellate Counsel*

Petitioner claims that appellate counsel failed to argue, on direct appeal, that trial counsel was ineffective for failing to conduct a complete pretrial investigation and for failing to make timely objections. However, as explained above petitioner's trial counsel claims are meritless. In the

12

appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins,* 528 U.S. 259, 285-86 (2000); *McCleese v. United States,* 75 F.3d 1174, 1180 (7th Cir. 1996). As explained in this Report, all of petitioner's claims are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal.

F.  *Recommendation Regarding Certificate of Appealability*

   1.  *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999)

13

(quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.  *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should conclude that petitioner is not entitled to a certificate of appealability. It is not reasonably debatable that trial counsel did not provide ineffective assistance at trial. It is also clear that the prosecutor did not make any inappropriate remarks. Therefore, it is not reasonably debatable that trial counsel was not ineffective for failing to object to such remarks. Finally, because

petitioner's trial counsel claims are without merit it is not debatable that his appellate counsel claims are without merit. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

      G.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation the Court should also deny petitioner a certificate of appealability,

III.      <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                    s/Paul J. Komives  
                                    PAUL J. KOMIVES  
Dated: 8/4/10                     UNITED STATES MAGISTRATE JUDGE

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on August 4, 2010.
>
>                         s/Eddrey Butts  
>                         Case Manager